Filed 5/13/22  In re Carson A. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re CARSON A., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.A., <br><br> Defendant and Appellant. | A162148 <br><br> (Humboldt County Super. Ct. No. JV2000097) |

Before us is the all too familiar story of estranged parents who are at odds with each other regarding what they believe is in the best interest of their child.  What began as a highly contentious family law dispute has turned into a vigorously contested juvenile dependency case.  On appeal, K.A. (father) challenges the juvenile court's orders asserting dependency jurisdiction over Carson A. and removing Carson from father's custody.[1]

---

[1] Because this case involves juvenile proceedings, we refer to the minor initially by first name and last initial to protect his privacy. (Cal. Rules of Court, rule 8.401(a)(2).) For ease of reading, we omit the minor's last initial in subsequent references.

Father contends he was denied due process when the juvenile court amended the dependency petition sua sponte to conform to proof. We affirm.

## BACKGROUND

### A.     Commencement of Dependency Proceedings

On May 27, 2020, the Humboldt County Department of Health and Human Services (the department) received a referral alleging child abuse and/or neglect of then 14-year-old Carson by father. Father took Carson's phone away while Carson was at father's house. In response, Carson left father's house, contacted his maternal grandmother,[2] and asked her to pick him up. Father went to the grandmother's house. Law enforcement was called because father was pounding on the doors and yelling; father had "impulsive rage and anger issues."[3] Following the incident, father forced Carson to wake up at 5:00 a.m. to go to work with father and "drag rebar across the yard." "Carson does not have a work permit, has learning challenges at school, and his father's actions reportedly prevent him from working on his schoolwork." It was reported that, as discipline, father makes Carson stand and face a corner. Carson felt he was being "tortured" and had suicidal thoughts of killing himself by either hanging or shooting himself; he had a previous suicide attempt in the summer of 2019. Carson was feeling helpless, hopeless, and fearful, reportedly only when in his father's care.

Following the initial referral, the department commenced an investigation detailed in the detention report filed on July 8, 2020.

---

[2] Carson's mother was reportedly out of state at the time.

[3] According to the report, father had exhibited similar behavior in the past at Carson's therapist's office and that, as a result, father is not allowed to contact or come near the therapist's office.

On June 18, 2020, a department social worker interviewed Carson, who reported a history of problems with father not allowing him to access his phone when at father's house. Carson stated his father blames his mother for his running away because Carson had "texted his mother and asked her what to do." Carson stated that his mother told him to go to his grandmother's house. Carson's brother saw him leave father's house at 10:30 p.m. (his grandmother was waiting across the street) and told father's girlfriend. Carson denied reports that he ran away because father and his girlfriend took away his video games. He ran away because, when at father's house, father "makes him want to hurt himself."

When asked how he might take his life, Carson stated "he would shoot himself because that was the easiest." Carson went looking for a gun three weeks earlier and found his father's gun safe but did not have the combination. Carson was "just done." Carson's father was screaming at him most of that week; he "screams so much he drools." When father yells he tells Carson his mother hates him and thinks he is "the bad kid," but Carson said he knows that is not true. As punishment for running away, father took Carson's phone, which is the way Carson contacts his friends and cousins — "the only thing that makes him happy" — and made Carson wake up at 5:00 a.m. and go to work with father. Carson thought father was angry with him because Carson does not like being at father's house. The social worker reported, "there are so many things that he doesn't like to talk about regarding his father's home," and it "makes him uncomfortable and sad, and that every time he thinks about it, it makes his stomach hurt." Carson felt that father's girlfriend Jessica had turned father's family against Carson, and they take her word over his. Jessica had lied about Carson on social media

and posted he uses "the 'N-word' every day." Jessica had also called him "fat."

Carson further stated that he sees a therapist, Dr. Roberta "Robin" Nolan, who father does not like, and father does not let Carson see or talk to Dr. Nolan while at his house. Dr. Nolan reported to the social worker that she previously had a plan in place with mother and father for successful co-parenting to reduce stress on Carson, but father was unable to follow the plan. Dr. Nolan also reported father called mother a "whore," put Carson down, and yelled at him. Dr. Nolan believed Carson was at a high risk of suicide if left at father's house.

The social worker met with mother about Carson's desire to find a gun and kill himself. Mother began to cry and stated that six months ago, Dr. Nolan had told her that Carson had plans to hang himself. Mother agreed that Carson needed more support and to contact Dr. Nolan about Carson's recent suicidal thoughts.

The social worker also spoke with father and expressed her concern about Carson wanting to hurt himself when at father's house. Father denied owning a gun and stated "the only gun in the house is a BB gun that does not work." Father stated that Carson discussed a plan to hang himself because Carson "was one of the first people to find the child who hung themselves at [his high school] and it was really affecting [him]." Father had told his children to speak with "another adult if they ever felt like doing something like that." The social worker asked father to make a safety plan for Carson to remain at mother's house for two weeks and for more supports; father agreed. After review of the safety plan the social worker sent him, father stated he believed mother was behind the safety plan and that she was trying to keep father from his children. The social worker created a final safety plan which

4

provided that Carson would always have his phone with him and would have regular check-ins with mother; Carson's paternal grandfather would pick Carson up if he needed to get away from father's house; Carson would tell an adult right away if he was feeling suicidal; and Carson would attend counseling as directed.

On June 22, 2020, mother reported to the social worker that while with father over the weekend Carson did not have access to his phone and no one knew how Carson was doing.

On June 25, 2020, father told the social worker that he wanted contact with Carson twice a day while he was with mother and a safety plan because mother had guns at her home. Mother denied having guns in the home and reported her boyfriend uses guns for target practice that he stores in an off-site location where Carson does not have access.

On June 26, 2020, Carson told the social worker that he never feels suicidal while at mother's house and did not feel suicidal during his last visit with father. The social worker spoke with father on July 2, 2020, and reported it seemed that father did not believe that Carson was suicidal at his home. The social worker suggested a new safety plan. Father refused, stated he felt the need to consult his lawyer, and hung up on the social worker. Later, the social worker received a text message from father indicating he would follow a safety plan, but the social worker had concerns that father seemed to minimize Carson's suicidal thoughts and would not follow a safety plan. The department determined it was necessary to place Carson in protective custody. The social worker met with father and Jessica on July 2, 2020, to provide notice. They both denied anything was wrong with Carson in their home and stated mother was influencing Carson. Neither father nor

5

Jessica were receptive to discussing Carson's mental health needs, and both would redirect the conversation back to mother.

## B.     Detention

### 1.     *Dependency Petition*

On July 7, 2020, the department filed a Welfare and Institutions Code[4] section 300 petition pursuant to subdivisions (b)(1) (failure to protect/general neglect) and (c) (serious emotional damage) on behalf of then 14-year-old Carson.

Under subdivision (b) of section 300, the department alleged the following facts: "b1: [Father] is unwilling or unable to provide adequate supports or services to address his son, Carson's, suicidal thoughts and feelings. [Father] did not follow a safety plan developed with the department to ensure that Carson had adequate support to remain safe while dealing with the child's suicidal ideation. [Father] removed Carson from his safety network and prevented Carson from having access to a telephone to contact his support network. Carson has reported two separate plans to kill himself. [Father] has stated that Carson's behaviors are due to his mother manipulating Carson and refuses to acknowledge Carson's mental health needs and the potential harm to Carson if his needs are not addressed. [¶] b2: [Father] does not allow Carson to participate in counseling when he is in his father's care."

Under subdivision (c) of section 300, the department alleged the following facts: "c1: Carson has stated that he feels suicidal while at his father's house due to his father frequently yelling at him. Carson has stated that talking about things that happen at his father's house makes him sad

---

[4] All further undesignated statutory references are to the Welfare and Institutions Code.

and uncomfortable and that every time he thinks about it, his stomach hurts. Carson has expressed to his mother and his counselor how his father's behaviors make him feel. [¶] c2: Carson has been exposed to his father's rageful and angry behavior, which has included the father going to Carson's grandmother's home while Carson was there and pounding on the windows and doors and yelling, which resulted in a call to law enforcement. The father and his girlfriend have verbally abused Carson; this abuse has included the father telling Carson that his mother hates him and that his mother thinks he is 'the bad kid' and the father's girlfriend posting defamatory comments about Carson on Facebook. [Carson] expressed that he had decided to kill himself because he was done."

In the detention report submitted in support of the section 300 petition, the department expressed concern "that Carson's father will continue to engage in behaviors in the home that contribute to Carson's feelings of helplessness, hopelessness and despair and that this could result in Carson harming or killing himself if he is allowed to remain in his father's care." The department further noted that safety plans had been created for Carson by the department and by Carson's counselor, but father was unwilling or unable to follow them.

2. *Detention Hearing*

At the detention hearing held on July 8, 2020, minor's counsel (who had also been representing Carson in a related family law proceeding for over two years) informed the juvenile court that she was in support of detention "given Carson's suicidal ideations at this point in time and the fact that this is a recurring event for Carson, which gives me great concern. We have already addressed this once before." Minor's counsel also advised the court that the

7

14-year-old youth expressed his discomfort with visitation with father at that time.

After hearing from all parties, the court granted father's request to be elevated to "presumed father status." The court further found a prima facie showing had been made that Carson was a child described by section 300, that continued detention from father's physical custody was necessary, and that placement with mother was appropriate. Father was provided with supervised visits a minimum of two times per week for two hours; the department was ordered to provide all parties "services in order to reunify the child with the family."

## C. Jurisdiction

### 1. *The Jurisdictional Report*

The department submitted a jurisdictional report that included information and witness statements and concluded with the department's recommendation for formal judicial intervention. The department's report revealed that there were several past investigations relating to reports of child abuse and neglect of Carson by both parents that began when Carson was still a toddler, though none had been substantiated.

The department reported that father and Jessica denied that Carson was unsafe in their home, disagreed with the department's decision to place Carson in protective custody, and claimed that Carson was being manipulated by mother. Father was unreceptive to discussing Carson's mental health needs and had refused to attend a child and family team meeting regarding Carson's care.

The department also informed the juvenile court that Carson was reluctant to engage in family meetings with father and to attend court because he feared father would yell at him. Carson also told the social

worker that father had been texting him messages such as "if you didn't want to be with me why don't you just tell me?" Father and Jessica had told Carson that if he were removed from father's care, he would end up in juvenile hall and be placed in a "straitjacket."

The department opined that father had not shown an adequate level of concern for Carson's mental health issues and disclosures of suicidal ideations and suggested that father's ongoing behavior and conduct would continue to contribute to Carson's feelings of helplessness, hopelessness, and despair that could result in Carson self-harming or committing suicide. The department believed Carson was being emotionally abused by father, including being yelled at, being called fat, and having negative comments publicly posted about him on Facebook by Jessica. The department recommended that the juvenile court sustain the allegations of section 300 petition pursuant to subdivisions (b) (failure to protect/general neglect) and (c) (serious emotional damage).

### 2. *Initial Jurisdictional Hearing*

The contested jurisdictional proceedings began on July 28, 2020, at which time father requested a *Marsden*[5] hearing to obtain new legal representation. The juvenile court excused the other parties to conduct the *Marsden* hearing, and the motion was denied. At father's request and without objection, the juvenile court took judicial notice of the related family law file, Humboldt County Superior Court case No. FL160259. The contested jurisdictional hearing was continued to the next available date of August 10, 2020.

---

[5] *People v. Marsden* (1970) 2 Cal.3d 118.

9

### 3. Continued Hearing

At the August 10, 2020 hearing date, father's newly retained private counsel appeared and requested a 30-day continuance. The juvenile court continued the contested jurisdictional hearing again to September 14, 2020, with a pretrial hearing scheduled on September 11, 2020. In advance of this next hearing, father's counsel submitted a "lodgment of reporter's transcripts"[6] from the related family law case which counsel asserted revealed that Carson was more properly described as "a misbehaving child who is failing school" rather than a "victim." At a June 21, 2018 hearing, the family court observed: "The best I could . . . surmise is that each of you [father and mother] spend a great deal of time . . . and energy disliking each other. And how you express that to the children, whether it be oral or otherwise, they are well aware of it. [¶] And until you change, that won't change. And if you don't think it [a]ffects them, just look at their status, state of . . . life at this time. [¶] . . . [T]hey are very mixed up, confused, looking for stability in respect by others, the parents in particular, to them, and back to each other. It's, quite frankly, not happening."

### 4. Father's Jurisdiction Hearing Brief

On September 10, 2020, father, through his counsel, filed a "jurisdiction hearing brief" in which he characterized the dependency proceeding as a disagreement between "two different parenting styles" with father's "emphasis on responsibility" and mother's "emphasis on doing what the children want." Father suggested Carson had been fabricating suicidal ideations to "manipulate" the family law case, questioned whether Carson was actively suicidal because he had not yet exhibited any self-destructive behavior, and described Carson's behavior as "fairly routine embroiled-

---

[6] The family law file is included in the record on appeal.

teenager fare in a family law case."  Father also wanted to compel Carson to testify at the jurisdictional hearing so that "Carson can . . . be confronted with his lies," asserting that it was necessary for the juvenile court "to understand that Carson is lying in order to make appropriate orders." Father opined that this case should return to the family law court for resolution, and that "[s]ustaining the petition will teach Carson that he can manipulate situations in the future by using the 's' word."

### 5. The Department's First Addendum Report

On September 14, 2020, the department filed an addendum to the jurisdictional report regarding previous familial conflicts which were documented by numerous police incident reports.  These conflicts include: (1) an October 15, 2018 trespassing incident committed by father; (2) a May 24, 2019 incident where father reported two of his sons were missing when they were subsequently found with mother; (3) a June 23, 2019 custody dispute where father reported that, contrary to a custody order, mother was refusing to give father a child, but the police investigation found the child was refusing to leave his room and go with father; (4) an April 24, 2020 report where father complained mother was not walking children out to his car for a visit; (5) a May 27, 2020 incident where Carson's grandmother requested assistance because father was outside her residence and Carson did not want to leave with father; (6) an August 17, 2018 report by father that mother was violating a custody order; and (7) a November 7, 2018 incident where mother struck and injured Carson.

### 6. Testimony at Contested Jurisdictional Hearing

Testimony at the September contested jurisdictional hearing was taken over two days.  At the outset of the jurisdictional hearing held on September 14, 2020, the department asked the juvenile court to sustain the section 300

petition as pled. Minor's counsel advised the juvenile court that "Carson is a troubled youth who does need lots of support" and clarified the issue before the court as "whether or not the father is willing and able to provide the supports necessary to address his needs. And I think the evidence is going to show that the father has been unwilling or unable to do so, hence the need for us being in court." Mother concurred with both the department's counsel and minor's counsel.

Father's counsel reiterated father's objection to Dr. Nolan providing therapeutic services to Carson, arguing that Dr. Nolan's earlier meetings with the family presented a conflict and further objected to the department's interpretation of the events leading up to Carson's detention. Father also noted that he had subpoenaed records from the Eureka Police Department, the Humboldt County Sheriff's Department, and Carson's school to be produced directly to the juvenile court. The juvenile court confirmed they had been received.

Carson testified that father and mother do not get along "really well" and do not talk. Carson was unsure if he liked Jessica. There was a time when Carson lived primarily with father and saw mother on the weekends. He was not happy at father's home. Carson admitted sending a text message to mother saying, "You don't love me" and another text message where he sent the "middle finger" to mother. Carson sent a text to father saying that mother punched him in the eye. Carson also acknowledged that in text messages, mother encouraged him to run away from father's house and said that Carson's brothers were "counting down the days" until they did not have to go to father's house, and "they hate it over there."

Carson told the social worker that Jessica lied about him on Facebook in saying he used the "N" word every day. He admitted to using the "N" word

12

but denied doing it regularly. Carson did not like it that Jessica posted that message on Facebook because he did not want people on Facebook seeing it.

Carson told the social worker that father screams at him, and "drool" comes out his mouth when he does, but it would be a lie to say father screams at him "the whole time." Carson reported that father told him mother said that she hated Carson and he is a bad kid.

Carson recalled the night he ran to his grandmother's house after getting in trouble or being yelled at for his brothers arguing. He had been playing video games that day, and around 4:30 in the afternoon father told Carson to put the phone away, turn the video games off, and do his homework. Later, by text message, Carson contacted mother and his grandmother and said he wanted to go to his grandmother's house. Carson's grandmother picked him up without informing father. After Carson left, father showed up at Carson's grandmother's house, where he banged on the glass of the door "really loud." Carson's grandmother told father that he needed to leave, and she "called the cops." The police arrived and sent Carson home with father. Father punished Carson by making him go to work with father and haul rebar around for a couple of hours. Carson also lost his phone privileges.

Carson testified that father took his phone away from him whenever they thought Carson "was on it too much." The last time was when Carson ran away, and father took Carson's phone away for more than a day. At the time, mother had bought Carson a new phone because that is what he wanted as a graduation gift, but father took that phone away as well.

Carson described other issues he had with father and/or with staying at his house, including "untruthful statements." Carson did not feel safe at father's house because he was lied to, not really trusted, and he did not feel

13

part of the family. The lies were about Carson's mother, school, and "pretty much everything." Father has said "really bad things" about mother, such as mother tries to take Carson away from father completely.

Carson admitted sending a pornographic video to a friend and a picture of a dildo to another person. He admitted that he had been struggling in school. Father submitted a report, which was received into evidence, showing that Carson's grades for the most recent term included three F's.

Carson did not recall the first time that he told someone that he was thinking of committing suicide. However, he did remember seeing a gun at father's house and telling the social worker that he would kill himself with that gun. On other occasions, Carson saw guns and knives in father's open safe.

Carson testified about his relationship with his current therapist, Dr. Nolan, who he began to see in late 2019. Carson said initially both his parents took him to therapy, but that his father eventually stopped taking him after father got in a disagreement with Dr. Nolan. Carson reported that his mother still took him to his counseling sessions with Dr. Nolan. Carson confirmed that he enjoyed his weekly sessions with Dr. Nolan and felt the sessions were a benefit to him. He recalled that his father would be brought in to speak with Dr. Nolan at the end of his sessions and family therapy would occur with his brothers as well. Carson recalled that this family therapy happened two or three times after he had started his individual counseling with Dr. Nolan. Carson also spoke about his past suicidal attempts and confirmed that he told a friend less than a year ago that he was thinking about committing suicide.

On September 18, 2020, at the conclusion of Carson's testimony, father moved for a directed verdict and requested that certain items be stricken

14

from the section 300 petition. Mother's counsel, minor's counsel, and the department's counsel opposed the request. Father's request for a directed verdict was largely based on his proposition that "[t]here is no evidence before the court that Carson is, in fact, suicidal." Father did concede that there was evidence that Carson may want to hurt himself but denied that there was any realistic plan or actual "competent evidence that this kid is suicidal."

7.     *Amendment of the Dependency Petition According to Proof*

After hearing from all parties, the juvenile court denied father's motion for a directed verdict. The court then turned to the specific language of the petition. Finding there was sufficient evidence presented to sustain the petition under subdivisions (b) and (c) of section 300, the court declined to strike specific portions of the pleadings but instead proposed amending the petition according to the proof:

"Both parents have unresolved conflict and continual hostility that has negatively impacted Carson, has substantially — negatively and substantially impacted Carson. Carson has emotional and behavioral problems as a result of this parental conflict, exemplified by moodiness, anxiety, school problems, and acts of defiance."

The court referenced specific aspects of evidence that supported the proposed language, opined that "having a continued hearing that just has people put on to say how bad Carson is will only make the language that I have outlined stronger," and provided an opportunity for counsel to separately discuss the proposed amendments with their respective clients. The court also offered, "[o]bviously, with that, Mother would be able to present evidence, if she wanted to, since it is different in that regard, and then, obviously, with the change of language, Father . . . could present

15

evidence in that regard." The court also acknowledged that "Obviously, the department could challenge or say that they think there should be other language."

After the parties and their counsel returned from their respective breakout rooms, all parties expressed their concurrence with the amended language without need for additional witnesses, except for father whose counsel indicated an interest in resolving the case and wanted to be able "to kind of break out and have some discussion about how this dependency case would look." He specifically raised concerns about an appropriate therapist and any implications on Jessica's ability to act as a foster parent and a daycare provider if there was a 300 finding. With those open details, father's counsel stated, "We're not prepared to agree." He also offered to call additional witnesses to contest the allegations that there was anger and yelling in father's house.

In response, the court clarified, "First of all, the court has modified the language of the petition, and that it's not a negotiable situation. And so, the petition is found true, and then we talk about what's going to happen, once it's true. That's disposition. And folks have a right to contest the disposition." The court further found "that what has been presented as offers of proof aren't relevant now to the petition as it's sustained."

The juvenile court sustained the amended petition and found by clear and convincing evidence that Carson was described by section 300, subdivisions (b) (failure to protect/general neglect) and (c) (serious emotional damage).

As summarized by the court, "The gist of it, essentially, is, is that both parents have unresolved conflict and continual hostility that has . . . substantially negatively impacted Carson; that Carson has emotional and

16

behavioral problems as a result of this parental conflict, exemplified by moodiness, anxiety, school problems and issues, and acts of defiance . . . . And I guess I would further put in that . . . the parental behavior sets bad examples for Carson, who . . . is still learning to form relationships and learn appropriate behaviors.  [¶] . . . [T]hat is what the court finds by clear and convincing evidence.  That is language that would both be in [section] 300(b) and (c) in the matter.

### D.    Disposition

The department filed its dispositional report and three addendum reports, recommending that Carson be declared a dependent of the court with continued placement in mother's home, with family maintenance services to mother and family reunification services to father.  The department further recommended that Carson remain with his current therapist, Dr. Nolan, pursuant to Health and Safety Code section 124260, which permits youths aged 12 years or older to consent to therapy without parental consent if they are mature enough to intelligently participate in therapy.  The department supported Carson's engagement in family therapy with his father that would be facilitated by a counselor who was suggested by father and father's counsel.

The evidentiary portion of the contested dispositional hearing took place over two days, January 15 and February 1, 2021.  After hearing testimony from numerous witnesses, including father, the marriage and family therapist, the Arcata Police Department's juvenile diversion counselor and parent project facilitator, and the social worker who wrote the dispositional report, the parties submitted written closing briefs.

17

On February 19, 2021, the juvenile court made an oral ruling declaring Carson a dependent and ordering family maintenance services to mother and family reunification services to father.

On March 1, 2021, the juvenile court issued its written dispositional order. Among other things, the court concurred with minor's counsel that "Carson is suffering emotionally because of the toxic relationship of his parents," and further observed that "the parents seemed trapped in a relationship dominated by a lack of trust." The court also found that Carson was "suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, and there are no reasonable means by which the child's emotional health may be protected without removing the child from the physical custody of father." The court further found by clear and convincing evidence that returning Carson to his father's physical custody would create a substantial risk of emotional harm to Carson.

Father appeals the jurisdictional and dispositional findings and orders.[7]

## DISCUSSION

Father contends he was denied due process when the juvenile court amended the dependency petition sua sponte to conform to proof at the jurisdictional hearing. The department counters that father's challenge to the juvenile court's jurisdictional findings is moot because he does not contest the court's dispositional findings; he is only seeking to reverse the dispositional order removing Carson from his care. The department posits that father has otherwise forfeited his due process claim by failing to timely

---

[7] Mother has not appealed the jurisdictional and dispositional findings and orders.

18

object to the court's amendments to the petition. Father maintains his challenges have been preserved and, in the event the issues are deemed forfeited, he was denied effective assistance of counsel.

## A. *Father Has Preserved His Challenge to the Jurisdictional Findings by Timely Appealing from the Disposition.*

In juvenile dependency proceedings, only the dispositional order is appealable; the prior jurisdictional order is reviewable on that appeal. (§ 395; *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [appeal from jurisdictional order was construed as appeal from dispositional order].) In the absence of an unambiguous stipulation, parents may appeal from a finding of jurisdictional even if they have stipulated to the dispositional order. (*In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1210 [stipulation to dispositional order did not waive parent's challenge to jurisdictional findings]; *In re Christie D.* (1988) 206 Cal.App.3d 469, 475 [following *Jennifer V.*]; *In re Eric A.* (1999) 73 Cal.App.4th 1390, 1394 [distinguishing *Jennifer V.* and dismissing appeal as moot where parent unambiguously stipulated to jurisdictional findings]; *In re Dani R.* (2001) 89 Cal.App.4th 402, 404 [appeal dismissed as moot where parents made unqualified admissions that jurisdictional findings and dispositional orders were supported by substantial evidence].)

Here, father's notice of appeal unambiguously states that he is appealing both the findings and orders from the jurisdictional and dispositional hearings. At no point in these hotly contested proceedings has father ever stipulated to the findings and orders of the juvenile court. Consistent with established appellate principles of law in dependency proceedings, we therefore reject the department's argument that father's appeal is moot.

19

## B.     *Father's Due Process Challenge Fails.*

Father argues that the juvenile court's sua sponte amendments to the petition deprived him of due process because: 1) the amendments were based on factual and legal theories not raised in the original petition, which deprived him of notice and a fair opportunity to be heard; and 2) by amending the allegations sua sponte the court assumed two roles: advocate and trier of fact, which deprived him a fair trial before a neutral arbiter.

We agree with the department that father's failure to object on these grounds at the jurisdictional hearing forfeits this argument on appeal.  (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1640 [had the mother raised her objection to the sufficiency of the petition at the jurisdictional hearing, the court could have allowed the child protective agency to amend the petition to conform to the proof offered at the hearing]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 ["when a parent had the opportunity to present [a defect in notice] to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal"]; see also *In re A.A.* (2012) 203 Cal.App.4th 597, 606 [by failing to object at the dispositional hearing, mother forfeited argument that the juvenile court violated her constitutional rights by failing to consider placing her children with her].)

In any event, we reach the merits of father's claim and conclude the juvenile court did not violate father's due process rights by amending the petition according to proof.[8]  A juvenile court can amend a dependency petition to conform to the evidence received at the jurisdictional hearing to

---

[8] Because we reach the merits of the father's due process challenge, we need not address his ineffective assistance of counsel claim.

remedy immaterial variances between the petition and proof. (§ 348; Code Civ. Proc., § 470.)  However, *material* amendments that mislead a party to his or her prejudice are not allowed. (Code Civ. Proc., §§ 469–470; *In re Andrew L.* (2011) 192 Cal.App.4th 683, 689 (*Andrew L.*).)

"Given the haste with which petitions are sometimes drafted, . . . the ability to amend according to proof plays an important role in the overall dependency scheme.  If a variance between pleading and proof—to use the traditional term of art from civil law [citation]—is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment.  [¶] The basic rule from civil law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice."  (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042, fn. omitted (*Jessica C.*).)

"[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused." (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; see *Jessica C.*, *supra*, 93 Cal.App.4th at p. 1043.)  "While the abuse of discretion standard gives the trial court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' [Citation.]  'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion.' " (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.)

*Jessica C.* illustrates the type of amendment that is appropriate in the dependency context.  There, the social services agency filed a petition alleging the minor's father had "penetrated his daughter's vagina with his penis," but

the child later testified that the father had only "touched her vagina with his penis." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1040.) The juvenile court denied the agency's request to amend the petition by substituting "touching" for "penetrating." (*Ibid.*) The appellate court reversed, holding the proposed amendment would not have prejudiced the father since it involved conduct and legal theories nearly identical to the original allegations. (*Id.* at p. 1042.) The court reasoned: "Here, it cannot be seriously maintained that [the father] would possibly have prepared his defense differently if the allegation had been that he had 'touched' his daughter's vagina with his penis, as distinct from 'penetrated.' The basic allegation was there, and any variance between 'touching' and 'penetrating' could not have misled him to his detriment. Both allegations are heinous, and entail the intimate violation of a child." (*Ibid.*)

Similarly, in *Andrew L.*, *supra*, 192 Cal.App.4th 683, 689–690, the court held it was not prejudicial error to conform the petition to proof by striking entirely a section 300, subdivision (a) count, as well as the specific allegation of a diagnosis of a subdural hematoma caused by trauma in the subdivision (b) count, when the remaining subdivision (b) allegations that the child was at substantial risk of serious physical harm or illness were proved.

By contrast, in *In re G.B.* (2018) 28 Cal.App.5th 475, 486 (*G.B.*), the juvenile court exceeded its authority to amend the petition to conform to proof where the court's amendments included allegations that "completely changed the grounds for establishing jurisdiction over G.B. Specifically, the court's allegations sought to establish jurisdiction over G.B. under a different legal theory than the original allegations (emotional abuse versus sexual abuse); they named father as an offending parent even though he was nonoffending in the original petition; and they were based on a set of facts

not at issue in the original allegations (father's alleged coaching of G.B. to fabricate allegations against mother and her boyfriend versus the boyfriend's alleged sexual abuse and mother's failure to protect G.B. against that abuse)."

Recently in *In re I.S.* (2021) 67 Cal.App.5th 918, our colleagues in Division Two of this appellate district held the juvenile court's amendments to the petition to conform to proof deprived the mother of her due process rights. The original petition raised allegations pursuant to section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse). (*Id.* at p. 921.) The juvenile court's amendments did not incorporate the "same 'basic allegation'" regarding mother's failure to protect [the minor] under section 300, subdivision (b). (*Id.* at p. 929.) Rather, similar to *G.B.*, the amended allegations "essentially sought to establish jurisdiction based on Mother's infliction of emotional abuse—a distinct basis for jurisdiction under section 300, subdivision (c), which was not alleged in the original petition." (*Ibid.*, fn. omitted.) Additionally, the amendments presented " 'entirely new theories: *actual* knowledge [of sexual abuse] contrasted with a conclusion that a reasonable investigation *might have led* to the discovery of sexual abuse.' " (*Ibid.*) The court concluded mother " 'would possibly have prepared [her] defense differently' " if mother's lack of diligence and the mere possibility of her knowing about the sexual abuse had been alleged as a basis for failing to protect I.S. against the risk of repeated sexual abuse. (*Id.* at p. 930.)

The juvenile court's amendments to the petition here are far more similar to those made in *Jessica C.* and *Andrew L.* than to those in *G.B.* or *I.S.* The juvenile court's amendments did not allege a new or distinct basis for jurisdiction as to father, but rather they narrowed the scope of the initial

23

pleading, which, as the court said "has lots of problems and issues." Under subdivision (b), the initial petition alleged multiple, specific grounds concerning Carson's suicidal thoughts and father's failure to provide adequate support or services, his removal of Carson from his safety network, and his blame of mother for Carson's behavior. Under subdivision (c) it further alleged exposure to father's frequent yelling, his rageful and angry behavior, defamatory comments, and blame of mother.

The amended petition framed the same conduct in more general terms, still focusing on the "continual hostility that has negatively impacted Carson" but expanding the context to include "both parents." As the court explained, "The father is not the only person who is in the wrong. The conduct of both parents and the conduct being painted by the department as one parent being in the light and the other all in the dark is also harmful to getting to a successful conclusion of this case as well."

And although the original petition did not expressly allege that parental conflict and hostility had negatively impacted Carson, it did include specifically related concepts such as father's failure to provide support, his removal of Carson from his safety network, and father's rageful and angry behavior. It is disingenuous to assert that such specifics initially alleged are distinct from the "continual hostility" as amended and found to be true. Parents' acrimonious relationship and its effect on Carson had been well-documented since prior to the inception of this dependency case, which included notice of the preceding contentious family law matter. The juvenile court's amendments merely summarized this largely acknowledged dynamic as demonstrated by the evidence presented. It cannot be seriously maintained that father "would possibly have prepared his defense differently" (*Jessica C., supra,* 93 Cal.App.4th at p. 1042) if the initial dependency

24

allegations had been that "unresolved conflict and continual [parental] hostility" had negatively impacted Carson.

On this record, we are hard-pressed to find how these variances could have misled father to his detriment. Moreover, after proposing the amendments, the court provided all parties the opportunity to consult and to potentially call additional witnesses. After this, all agreed to the amended language,[9] and no one asked to call any witnesses different from those originally contemplated.[10]

This brings us to father's additional argument that the juvenile court failed to act as a neutral arbiter when it crafted, asserted, and adjudicated jurisdiction allegations against parents. Relying on *G.B.*, father contends the juvenile court assumed the dual roles of advocate and trier of fact when it amended the allegations to conform to proof. *G.B.* is readily distinguishable. In *G.B.*, after dismissing the allegations against the offending parent, the court on its own motion crafted, asserted, and adjudicated "new allegation against a *nonoffending parent* based on a factual and legal theory not at issue in the original petition." (*G.B., supra,* 28 Cal.App.5th at p. 487, italics added.) Here, father, as the original offending parent, was on notice of the legal and factual theories, which as discussed *ante*, were not materially

---

[9] Father's counsel did not object to the language of the amendment, as father concedes, but instead wanted to "break out and have some discussion about how this dependency case would look."

[10] Father offered additional witnesses to disprove the allegations of anger and yelling in the house, which were contemplated prior to the proposed amendment and, as the court said, "aren't relevant now to the petition as it's sustained."

changed by the amendments.[11] We conclude the juvenile court did not violate father's due process right to fair trial.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.


DESAUTELS, J.[*]

WE CONCUR:

POLLAK, P. J.
STREETER. J.

---

[11] We note that mother, as a nonoffending parent in the original petition, may have a claim similar to that in *G.B.*; however, she has not appealed this issue.

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.